## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## CIVIL DIVISION

_____

**JEANETTE and KENNETH VAUGHAN,**

      Plaintiffs.

                                    **Case No.**

v.

**DIAMONDS INTERNATIONAL LLC;**
**ALMOD DIAMONDS LTD; ROYAL**
**CARIBBEAN CRUISES LTD; and**
**ROYAL MEDIA PARTNERS LLC.**

      Defendants.

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Jeanette Vaughan ("Jeanette") and Kenneth Vaughan ("Kenneth") (collectively "Plaintiffs" or the "Vaughans"), through their undersigned counsel, file this Complaint against Defendants Diamonds International LLC ("Diamonds International"), Almod Diamonds Ltd. ("Almod Diamonds"), Royal Caribbean Cruises Ltd. ("Royal Caribbean"), and Royal Media Partners LLC ("Royal Media"), (collectively "Defendants"). Based on information and belief, Plaintiffs state as follows to the Court and Jury for their causes of action against Defendants:

## PARTIES

1.     Jeanette Vaughan and Kenneth Vaughan are natural persons who are citizens and domiciles of Lithonia, Georgia, with a permanent home address at 1583 Rogers Crossing Drive, Lithonia, GA 30058.

2.      Diamonds International is a New York limited liability company formed pursuant to New York Limited Liability Company Law § 203. According to Diamonds International's LinkedIn profile, the company's principal place of business is located at 12 East 49th Street, 39th Floor, New York, New York 10017;[1] and, according to its website, it operates more than one hundred twenty stores across the United States, specifically, in Alaska, Florida, as well over one hundred locations throughout the Caribbean. Thus, Diamonds International is a resident and domicile of New York.

3.      Almod Diamonds[2] is a New York business corporation formed pursuant to New York Business Corporation Law § 402. According to the New York State Secretary of State, Almod Diamonds' principal place of business is 12 East 49th Street, 39th Floor, New York, New York, 10017;[3] and, according to the company's unique website, Almod Diamonds manufacturers, produces, and sells diamonds and other jewelry throughout the United States and Caribbean. Thus, Almod Diamonds is a resident and domicile of New York.

4.      Royal Caribbean Cruises Ltd. d/b/a "Royal Caribbean International" ("Royal Caribbean"), a Liberian Company, with a principal place of business at 1050

---

[1]      Oddly, Diamonds International does not have principal place on file with the Secretary of State. Alarmingly, the retailer is associated with several addresses across Manhattan despite the Bronx being on file with the Secretary of State. For instance, the Better Business Bureau lists 1290 Avenue of the Americas, 32ndFloor New York, NY 10104, while Google and Dun & Bradstreet list 100 Park Avenue New York, NY 10017.

[2]      According to the Secretary of State's website, since August 12, 2012, Almond Diamonds has used the assumed business name DI Finance Service.

[3]      However, according to Almod Diamond's profile on the De Beers Group website, the company's "Head Office" is located at 592 Fifth Avenue, 9th Floor, New York, NY 10036, and it lists Diamonds International's website as its own.

Caribbean Way, Miami, FL 31132, markets and sells cruises to person throughout the United States, including New York. Thus, Royal Caribbean is a resident and domicile of both Liberia and Florida.

5.     Royal Media Partners LLC ("Royal Media), a Florida limited liability company, with a principal place business at 960 Alton Road, Miami Beach, Florida 33139, employs Port Shopping Guides to give Port Shopping Talks and specialty seminars to cruise passengers aboard the cruise ship of several cruise lines, including Royal Caribbean Cruises Ltd. Thus, Royal Media is a resident and domicile of Florida.

## JURISDICTION & VENUE

6.     The Court has personal jurisdiction over Diamonds International because it has purposefully availed itself of the privilege of conducting business within Florida through Diamonds International retail stores located in Key West and Orlando. According to the New York Secretary of State, Diamonds International's registered agent – for service of purpose – is Gary Wirth, Altier, Kushner, Miuccio, and Frind, P.C., 60 East 42nd Street, New York, New York 10165.

7.     The Court has personal jurisdiction over Almod Diamonds because it has purposefully availed itself of the privilege of conducting business within Florida through its subsidiary's retail stores located in Key West and Orlando. According to the New York Secretary of State, Almod Diamonds' registered agent – for service of process – is Corporation Service Company, 80 State Street, Albany, New York 12207.

8.     The Court has personal jurisdiction over Royal Caribbean because Royal Caribbean is a resident and domicile of Florida. According to the Florida Secretary of

State, Royal Caribbean's registered agent – for service of process – is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

9.     The Court has personal jurisdiction over Royal Media because Royal Media is a resident and domicile of Florida. According to the Florida Secretary of State, Royal Media's registered agent – for service of process – is Sylvia Berkshire, 960 Alton Road, Miami Beach, Florida 33139.

10.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiffs Jeanette Vaughan and Kenneth Vaughan and Defendants Diamonds International, Royal Media, and Royal Caribbean are completely diverse parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     Venue is proper in the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(c)(2), and 28 U.S.C. § 1391(d).

## STATEMENT OF THE CASE

### I. Collusion Among Defendants to Defraud the Plaintiffs

#### A. *Diamonds International*

12.     Diamonds International – the largest jewelry retailer in the Caribbean with more than 125 retail locations – sells grossly overpriced jewelry to port-city tourists using intense deceptive, unfair, and unethical business practices, including misleading customers and outright fraud.

13.     Diamonds International's stores are located almost exclusively at port cities, such as Nassau, Grand Turk, Playa Del Carmen, Cozumel, among others, so the retailer heavily relies on cruise ship passengers for many of its sales.

14.     Diamonds International's business model relies on a steady stream of one-off transactions with unsuspecting cruise ship passengers who: (1) are on vacation; (2) are not familiar with Diamond International's reputation for misleading and cheating customers; and (3) have been primed to buy from Diamonds International by the cruise line and/or its associates.

15.     Diamonds International – headquartered in New York – has a large percentage of customers, like Kenneth and Jeanette Vaughan, who are American cruise ship passengers.

16.     Diamonds International, from its New York headquarters, administers, controls, directs, and manages the company's operations and activities, as well as implements the policies of its retail stores.

17.     Diamonds International – through its founders Morris Gad, Albert Gad, Donna Gad, Abe Tarapani, and Wendy Tarapani from its New York headquarters – "oversee[s] every aspect of [Diamonds International's] daily operations," including directing discrete overseas transactions, directing sales strategy, and authorizing the terms and financing offered to customers for specific jewelry purchases.

18.     Diamonds International's business model, and sales strategy, has resulted in numerous online complaints, negative reviews, and warnings on many reputable consumer websites, such as the Better Business Bureau and Trip Advisor.

Specifically, the Better Business Bureau reports that customers complain that Diamonds International sells "flawed or inferior merchandise" that is grossly overpriced, and "that the jewelry that they bought from Diamonds International is defective." "Several consumers claim that the results of an independent appraisal from local gemologist for the jewelry they purchased from the company is much lower than what they were told at the time of purchase. In some cases, the difference in the independent appraisal is reportedly several thousands of dollars less than what was paid for the Diamonds International merchandise."[4]

### B. Royal Caribbean

19. Royal Caribbean, based in Miami, Florida, is the largest cruise line by revenue, second largest cruise line by passengers count, and operates twenty-six cruise ships, five of which are the largest passenger ships in the world. Royal Caribbean offers cruises of different classes, different lengths, and different destinations

20. A typical week-long Royal Caribbean cruise offers its passengers several day-long stops at port cities along the way and various on-board amenities/activities for passengers while the cruise ship is traveling between ports.

21. Royal Caribbean's financial success depends largely on the amount of revenue Royal Caribbean can derives from its passengers after they board the ship, either directly or by selling third-party vendors access to their passengers. Diamonds International is one such third-party vendor.

---

[4] https://www.bbb.org/us/ny/new-york/profile/jewelry-stores/diamonds-international-0121-7969.

C. *Royal Media*

22.     Royal Media is the exclusive onboard media partner of Royal Caribbean that provides customized Port Shopping services for ships in the Royal Caribbean fleet sailing in the Caribbean, Mexico, Alaska, the Bahamas, and Europe.

23.     In order to provide passengers with a customized shopping experience, Royal Caribbean either provides a hard copy or encourages passengers to download a mobile phone application of a Royal Media-created shopping magazine called "Portfolio – The Official Port & Shopping Guide of Royal Caribbean" (the "Guide") as well use Royal Media employed Port Shopping Guides ("Shopping Guides"), who live and work aboard Royal Caribbean's cruise ships, to "provide cruise passengers with information about the exciting shopping opportunities that await in each port of call."

24.     "Shopping Guides" serve as Royal Media's ambassadors and points of contact for Royal Caribbean as well as all Royal Media's merchant *partner* stores, such as Diamonds International. Essentially, Royal Media, Royal Caribbean, and their merchant *partner* Diamonds International work in tandem where Royal Caribbean encourages passengers to meet Royal Media Port Shopping Guides and attend Port Shopping Talks and "Diamonds and Gemstone Seminars" that promote their merchant partners.

25.     Royal Media "Shopping Guides" gain the passengers' trust by holding themselves out as "experts" – "an excellent resources for information and *insider* tips" – who provide a *service* or *benefit* to help passengers find the best shopping deals at

7

port stops. "Shopping Guides" demonstrate their expertise by hosting Port Shopping Talks and "Diamond and Gemstones Seminars."

26.     "Shopping Guides" lure passengers to the Port Shopping Talks and "Diamond and Gemstone Seminars" by offering "VIP Cards," "Treasure Packs," and generous discounts cards up to 75% off – all intended to convince passengers that they will receive "elevated service at select stores" that include Diamonds International.

27.     Royal Media incentivizes "Shopping Guides" to push passengers to their merchant partners – oftentimes suggesting a specific salesperson – in order to enjoy "lucrative earning[s] . . . and performance-based bonuses"; motivating "Shopping Guides" to even physically escort passengers to Diamonds International stores the morning following the "Diamonds and Gemstone Seminar."

## II.   The Value and Quality of the Diamond Jewelry

28.     Royal Media and Royal Caribbean market the Port Shopping Talks and "Diamond and Gemstone Seminars" as educational seminars where unsophisticated passengers are taught the characteristics to consider when shopping for diamonds so that they purchase the best quality diamonds at the best value.

29.     Royal Caribbean and Royal Media use the Guide to mislead passengers with false promises on the value, quality, and discounts they will receive on designer jewelry and brand name watches; suggesting that passengers can purchase luxury jewelry, such as diamond pendant necklaces, "at prices up to fifty percent less that what [they will] pay for the same items on the U.S. mainland."

30.     A diamond's value is determined by the quality of the "4Cs" (in no particular order) – clarity, color, carat weight, and cut – that is graded by a reputable diamond laboratory, such as GIA and AGS.

31.     Clarity measures a diamonds imperfections based on visible blemishes, which are external flaws such as chips and scratches, and inclusions, which are internal flaws such as crystals and feathers. According to the Gemological Institute of America, "evaluating diamond clarity involves determining the number, size, relief, nature, and position of these characteristics, as well as how these affect the overall appearance of the stone." Diamonds are graded: flawless (FL), very very slightly included (VVS), very slightly included (VS), slightly included (SI), or included (I).



32.     Color "measures the degree of colorlessness by comparing a stone under controlled lighting and precise viewing conditions to master-stones of established color value." An untrained eye is unlikely to recognize the subtle differences between colors." A diamond is either colorless, near colorless, faint, very light, or light; and are graded on a D to Z scale, where a grade D is "colorless" and a grade Z is "light." Most diamonds at retail jewelry stores range from "colorless" to "near colorless."



33.     A common misperception is that "cut" refer to a diamond's shape (round, pear, cushion, marquí, etc.). Rather, "cut" refers to the way a diamond's facets interact with light, which many people associate with a diamond's brilliance. Brilliance is measured in terms of: brightness, which refers to "internal and external white light reflected from a diamond"; fire, which refers to "the scattering of white light into all the colors of the rainbow": and scintillation, which refers to "the amount of sparkle a diamond produces, and the pattern of light and dark areas caused by reflections within the diamond." The more brilliant the diamond the better the quality.

34.     Carat is the measurement of a diamond's weight. One carat equals 200 milligrams and measured to the hundredth decimal point. A diamond's price increases with diamond carat; however, diamonds of equal carat weight can have different values because value is determined by considering all 4cs.

35.     Generally, diamond purchases are accompanied by a certificate from one of the industry's leading gemological laboratories, such as Gemological Institute of America (GIA) and American Gem Society (AGS) which are considered the industry "gold standard." Less reputable laboratories include the European Gemological Laboratory (EGL) and International Gemological Institute (IGI) whose grades for clarity and color are typically off by 2-4 grades when compared to GIA and AGS graded diamonds.

36.     In addition to EGL, Diamonds International uses a younger EGL-owned laboratory named Gemology Headquarters International (GHI), established in 2015 after accusations of over-grading, to certify its diamonds, including the "branded, patented, and proprietary" Crown of Light diamond that is exclusively sold by Diamonds International.

37.     According to a May 2016 edition of *Jewelry Insurance Issues*, "the 90-facet cut is promoted as an improvement over the popular round brilliant diamond, with its 57 or 58 facets." And, according to Diamonds International, the Crown of Light cut produces "a spectacular diamond that disperses more light in more directions…with more fire than diamonds have ever achieved." However, gemologists agree that, "more facets do not equal more fire or scintillation." "Physics and optics have shown that a round brilliant diamond displays the most sparkle when cut to the proportions shown in this diagram, and this has been recognized by gemologists for some time."



38.     Diamonds International's tagline describing the Crown of Light diamond as "branded, patented, and proprietary" is misleading because Diamonds International is neither the inventor nor assignee of Crown of Light registered U.S. patent (No. US 6,761,044 B2; filed on April 11, 2002). The U.S. patent identifies Stuart Samuels as the inventor of the gemstone cut, and his company Premier Gem Corp. as the assignee. The tagline coupled with the fact that Diamonds International is the exclusively retailer of the Crown of Light diamond misleads consumer into believing that Diamonds International is the inventor of the Crown of Light gemstone cut. Even more so when the company describes itself as an innovator in the diamond industry.

39.     Unsuspecting passengers fall prey to a sophisticated marketing scheme facilitated by Royal Caribbean and Royal Media where passengers are promised generous discounts to encourage them to patronize Diamonds International stores to

purchase the exclusive "branded, patented, and proprietary" Crown of Light diamond, only for Diamonds International to disregard those discounts and upcharge them instead.

40.     Diamonds International convinces passengers that the Crown of Light diamond is worth more than its actual value when compared to diamonds of similar clarity, color, and carat weight. Diamonds International confidently encourages customers, upon returning home, to take their purchase, along with the Statement of Value,[5] to an "independent appraiser" who is trained in assessing the value of the Crown of Light diamond.

41.     Crown of Light diamonds are often appraised at a lower value and lower quality after a post-purchase appraisal once passengers arrive home. According to one trained "independent appraiser," persons authorized to appraise the Crown of Light diamond are required to contact Diamonds International for information when appraising the Crown of Light diamond, and that Diamonds International usually provides a valuation that mirrors the price paid by the customer, rendering the appraisal anything but *independent*. Yet, Diamonds International will only accept, as valid, appraisals by persons who follow this procedure; often, leaving customers without a legitimate *independent* appraisal.

---

[5] The Statements of Value, which are not received until several months after the purchases, are misleading, and the name is a misnomer, because the Statement does not accurately reflect the actual value of the item discussed in the Statement. Instead, the Statement reflects the purchase price of the item.

### III.   The Vaughans' Trip Aboard "Symphony of the Seas"

#### A.  *The Diamond and Gemstone Seminars*

42.   On November 30, 2019, Jeanette and Kenneth Vaughan set sail on a seven (7) day Royal Caribbean "Symphony of the Seas" cruise that made stops at several international ports, that included St. Thomas and St. Maarten.

43.   Jeanette, a retired military officer, and Kenneth, a retired logistics specialist, were frequent cruise passengers who often enjoyed the plethora of events and activities offered on board as the ship sailed between ports.

44.   Jeanette and Kenneth just so happened to be in the market for new jewelry, however, the couple lacked experience, knowledge, and sophistication when it came to the diamond market, and, ultimately, in diamond purchases.

45.   Jeanette and Kenneth understood that their inexperience and lack of sophistication would be a hindrance when purchasing diamonds – especially, the "branded, patented, and proprietary" Crown of Light diamond – so the couple appreciated that they would benefit from attending two Diamond and Gemstone Seminars led by a Royal Media Shopping Guide who held himself out as an "expert," "an excellent resources for information and insider tips," and who promised generous discounts toward the purchase of jewelry from the Crown of Light diamond collection that is sold *exclusively* at Diamonds International retail stores.

46.   On the morning of December 1, 2019, Jeanette and Kenneth attended the first of two Diamond and Gemstone Seminars that featured hundreds of cruise passengers in a large auditorium where a Shopping Guide introduced several lines of

jewelry – one of which was the Crown of Light diamond collection. The second "breakout session," which occurred later that afternoon in a smaller setting of roughly twenty-five (25) cruise passengers, provided the Shopping Guide with the intimacy and opportunity to manipulate cruise passengers – apropos, future Diamonds International customers – into believing that he had their best interests in mind; rather, than Diamonds International's profits and his bonuses and commissions in mind. The "breakout" room featured a display case filled with jewelry under lighting contrived and manipulated to artificially enhance the Crown of Light diamond's brilliance.

47.     When Jeanette and Kenneth arrived at the breakout session, they each were handed a card on which they would takes notes on the 4Cs that should have presumably proven useful when they made their future purchases the next day at the Diamond International's St. Maarten retail store. The couple took copious notes as they listened to the Shopping Guide marvel, rave, and, eventually, convince them of the Crown of Light diamond's exclusivity, quality, and value.

48.     During the Diamond and Gemstone Seminar, the Shopping Guide made numerous material misrepresentations:

(a) The Shopping Guide misled Jeanette and Kenneth, as well as other cruise passengers, into thinking that the Shopping Guide was a Royal Caribbean employee offered by the cruise line for the cruise passengers' benefit by "provid[ing] cruise passengers with information about the exciting shopping opportunities that await [them] in each port

15

of call." At no point did the Shopping Guide disclose that he was an employee of third-party marketing company Royal Media which was hired by Royal Caribbean to direct and drive cruise passengers to Diamonds International retail stores to buy grossly overpriced jewelry that resulted in lucrative kickbacks in the form of generous bonuses and commissions for the employees.

(b) The Shopping Guide fraudulently misrepresented to Jeanette and Kenneth, as well as other cruise passengers, that the prices of Crown of Light diamonds were significantly cheaper – in many instances fifty percent (50%) cheaper – in the Caribbean than in the United States because:

    i.    Customers were able to purchase Diamonds International jewelry "duty free"; thus, they did not pay local and national taxes if they planned to take the jewelry out of the country where it is purchased; and

    ii.    Diamonds International is a vertically integrated company that buys diamonds from its parent company – Almod Diamonds, Ltd. – one of approximately eighty (80) companies that have "sightholder" status with De Beers Group which allows Almod Diamonds to make bulk purchases of rough diamonds that, under normal circumstances, reduced the cost to acquire, manufacture, distribute, and retail sale the diamonds. Yet,

16

Diamonds International's Crown of Light collection defies reason because the diamonds are significantly more expensive than diamonds of comparable carat, clarity, and color.

(c)   The Shopping Guide fraudulently misrepresented to Jeanette and Kenneth, as well as the other cruise passengers, that the Crown of Light cut disperses more light than a round cut diamond; and, therefore, is more brilliant and sparkles more. In fact, the Shopping Guide even passed around a Crown of Light diamond for attendees – who did not realize that the room's lighting had been contrived and manipulated – to get an up-close glimpse of the diamond's artificially enhanced brilliance. Not only did the Shopping Guide use this contrived and manipulated lighting at the breakout session, the Diamonds International retail store also used similarly contrived and manipulated lighting to artificially enhance the Crown of Light diamond's brilliance for customers making in-store purchases. At one point, Jeanette complained that she was unable to visually appreciate a particular diamond's brilliance so she was instructed to look at the diamond under different lighting – specifically, sunlight in this instance.

(d)   The Shopping Guide fraudulently misrepresented to Jeanette and Kenneth, as well as the other cruise passengers, that a Crown of Light diamond was significantly more valuable than a round brilliant diamond of similar carat, clarity, and color. Indeed, the

17

Shopping Guide confidently represented that an independent appraisal of the Crown of Light diamond would prove the diamond's superior quality and value, and, in fact, encouraged customers to have their jewelry independently appraised for assurance and peace of mind upon their return back home to the United States. In addition, the Shopping Guide fraudulently misrepresented to Jeanette and Kenneth, as well as the other cruise passengers, that their Crown of Light diamond purchases were great investments because the jewelry would appreciate over time, resulting in an increased resell value. That statement belies the truth because the Crown of Light diamond is consistently significantly devalued when independently appraised and compared to a round brilliant diamond of similar carat, clarity, and color. More importantly, a resell market for Crown of Light diamonds does not exist because Diamonds International is the exclusive retailer of the collection; thus, customers are left feeling cheated, shafted, and swindled.

(e)     The Shopping Guide's statement that the "branded, patented, and proprietary" Crown of Light diamond is *exclusively* sold at Diamonds International is misleading because it gives a false impression – to reasonable buyers like Jeanette and Kenneth – that Diamonds International invented the Crown of Light diamond's unique ninety-eight (98) facets, when, in reality, the diamond cut was *invented* by Stuart Samuels and *assigned* to his company, Premier Gem Corp.

Neither Stuart Samuels nor Premier Gem Corp. has an affiliation with Almod Diamonds or Diamonds International. Thus, Diamonds International does not have any intellectual property or ownership interests in patent of the gemstone cut that is the Crown of Light diamond.

(f)    The Shopping Guide fraudulently misrepresented – both at the seminars and on the "Port Shopping Guide Caribbean" app – that the "shopping experts invite only the top stores in each destination to be part of the Port Shopping program and guarantee any purchases made at stores listed on the official Port Shopping map." Moreover, the Shopping Guide falsely guaranteed an elevated level of service and generous offers and giveaways in the form of VIP Cards and Treasure Packs, respectively, for the sole purpose of directing and driving cruise passengers to Royal Caribbean and Royal Media's merchant partners – in this instance, Diamonds International.

49.    Jeanette and Kenneth relied on the Shopping Guide's fraudulent misrepresentations regarding the quality and value of the Crown of Light diamond throughout their shopping experience. In fact, Jeanette and Kenneth were forced to rely on the fraudulent misrepresentations because they could not independently verify the Shopping Guide's claims, which were echoed by other agents, employees, and/or representatives of Diamonds International, by doing their own research since

they lacked access to the internet nor could they use their mobile device as a personal hotspot.

50.     The Defendants intentionally made fraudulent misrepresentations to Jeanette and Kenneth because they knew the couple would rely on those fraudulent misrepresentations out of a false sense of trust and confidence in Royal Caribbean and Royal Media's endorsement of the companies' merchant partner Diamonds International's brand and products. Jeanette and Kenneth would have been more critical and discerning of the fraudulent misrepresentations had the couple known of the financial relationship that incentivized the companies' endorsement.

51.     In a June 2006 Europa Star interview, Wendy Tarapani, Diamonds International's Executive Director, tacitly acknowledged Diamonds International, Royal Caribbean, and Royal Media's symbiotic relationship and underscored the importance of the cruise industry to Diamonds International's business model and strategy. There, Tarapani, referring to Diamonds International, said, "We are **backed by all major cruise lines** . . . [W]e are every major **cruise line's number one recommendation** for diamonds, fine jewelry and watches [because] passengers have the confidence to purchase with DI as a US based customer knows that their cruise line stands behind Diamonds International."[6] The relationship operates as a loop. In fact, at one point during Jeanette and Kenneth's shopping experience, the

---

[6] Keith W. Strandberg, *Executive Interview with Leading Retail Group Diamonds International*, EUROPA STAR INT'1, June 2006, https://www.europastar.com/retail-world/1002764361-exclusive-interview-with-leading-retail-group.html (last visited Nov. 15, 2022).

Shopping Guide commented on the "deals" that he had been given from Diamonds International's employees for steering cruise passengers to the diamond retailer.

52.     After the "breakout session," Jeanette and Kenneth returned to their stateroom with two discount certificates – a certificate for one thousand dollars ($1,000) towards the purchase of an item from the Crown of Light collection, the other for seventy-five percent (75%) off.

53.     Anxious and excited about the shopping experience that laid ahead, and their Crown of Light diamond purchases, Jeanette and Kenneth, with their two discount certificates in hand, were among the first passengers off the ship the next morning.

> ### B. Jeanette and Kenneth's Diamonds International Retail Store Experience

54.     When Jeanette and Kenneth arrived at Diamonds International's St. Maarten store (Store No. 509), they were greeted by a sales associate named Zubin who previewed the Crown of Light collection for the couple as they waited for Senior Store Manager Anil Vaswani ("Vaswani") to take over – at which point they presented Vaswani with their two discount certificates. Immediately, Vaswani was aggressive, dishonest, disingenuous, and insincere. Vaswani snatched Jeanette and Kenneth's discount certificates then assured the couple that they did not need the discounts because he would give the couple the "best deal" (without any tangible proof) for the jewelry's quality, present value, and resell value. This was not Vaswani's first time at the rodeo. Instead of giving the couple the "best deal," he treated them as a one-off sales transaction because he knew, and certainly ensured, he would never see the

couple again. The reason for his treatment is clear: Diamonds International, as Wendy Tarapani tacitly admitted, partnered with Royal Caribbean and Royal Media to direct and drive cruise passengers to the diamond retailer – ensuring a constant stream of revenue despite the diamond retailer's low-quality goods and poor customer service.

55.     Initially, the couple had two goals: (1) upgrade Jeanette's De Luce Collection Marquise diamond ring; and (2) buy her a new tennis bracelet. Jeanette initially intended to pay for both items with her Diamonds International credit card. After learning the total monthly payment for both items, Jeanette expressed concern that limit on her credit card would not cover that monthly payment. This provided Vaswani, who had already devised his scheme, with an opening. He, then, made a call to Diamonds International's financing department to see if Jeanette was eligible for a credit limit increase. Because of Jeanette's unblemished credit, Diamonds International willingly increased Jeanette's credit limit from five thousand dollars ($5,000) to one hundred thousand dollars ($100,000). Armed with this information, Vaswani, then, proceeded to make numerous fraudulent misrepresentations, blatantly manipulate and scheme, and apply relentless pressure – ultimately, convincing the couple to spend that credit limit increase on grossly overpriced jewelry that the couple would not have otherwise purchased had it not been for Vaswani's actions. In sum, instead of leaving the store with the upgrade and tennis bracelet, Jeanette and Kenneth left with: (1) a Hublot diamond watch (the "Hublot"); (2) a diamond pendant necklace; (3) a diamond tennis bracelet; (4) the Blue Sapphire ring

upgrade (the "Blue Sapphire"); (5) a Philip Stein watch and sleep bracelet set (the "Philip Stein"); and (6) two diamond crucifix necklaces – one black diamond, one blue diamond.

56.     Vaswani parroted the same fraudulent misrepresentations as the Shopping Guide as the latter greased Jeanette and Kenneth for Vaswani's relentless pressure. Not only did Vaswani double-down on the Shopping Guide's fraudulent misrepresentations, he went even further. Vaswani falsely promised that Jeanette and Kenneth would receive several *complimentary* gifts with the purchase of the Hublot, diamond pendant, and diamond crucifix necklace. Vaswani blatantly lied that Jeanette's Blue Sapphire was an upgrade to her De Luce Collection Marquise diamond ring ("Marquise"); and Vaswani fraudulently misrepresented that the Blue Sapphire ring contained *both* sapphires and diamonds when it does not contain the latter.

### A.     *Complimentary Gifts*

57.     Vaswani, in his manipulative effort to upsell, lied when he told Jeanette and Kenneth that they would receive several *complimentary* gifts if the couple purchased certain items. For instance, Vaswani induced Jeanette into buying the Hublot by promising the couple the *complimentary* Philip Stein for Kenneth. In addition, Vaswani promised Jeanette a *complimentary* 14K white gold adjustable sparkle chain if she purchased a diamond solitaire to refashion into a diamond pendant necklace. Lastly, he promised Kenneth a *complimentary* sterling silver chain necklace if Kenneth bought the black diamond crucifix necklace.

58.     Vaswani never intended to give Jeanette and Kenneth these items as *complimentary* gifts. Merriam-Webster's Dictionary defines "gift" as "something voluntarily transferred by one person to another without compensation."[7] Neither the Philip Stein watch, 14K gold adjustable sparkle chain, nor the sterling silver chain necklace were gifts because, according to the sales receipt, Jeanette and Kenneth paid for each of these items. It was a ruse to upsell the couple into buying nearly forty thousand dollars ($40,000) worth of jewelry that they would not have otherwise purchased had they not relied on Vaswani's lie that jewelry was indeed free.

B.      *Blue Sapphire Ring "Upgrade"*

59.     Jeanette and Kenneth's priority was to upgrade Jeanette's De Luce Collection Marquise diamond ring (the "Marquise") the couple bought for five thousand five hundred dollars ($5,500) around July 2017. Jeanette explicitly told Vaswani that the upgrade should cost more than her Marquise. Moreover, the "Diamonds/Jewelry Upgrade" section of the "Terms and Conditions" ("Terms and Conditions") on the back of the sales receipt reads, "New purchase price must be at least twice the amount of the original unset diamond purchase and/or jewelry purchase." Per both Jeanette's expectations and the Terms and Conditions, the upgraded ring – the Blue Sapphire – should have cost at least eleven thousand dollars ($11,000). Yet, the Blue Sapphire did not. Both the sales receipt and Statement demonstrably prove that the Blue Sapphire's cost, and value, was four thousand six

---

[7]     Definition of *gift*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/gift (last visited Nov. 15, 2022).

hundred dollars ($4,600) – considerably less than the required price by the Terms and Conditions.

60.     Jeanette asked Vaswani about the Blue Sapphire's cost when he first showed her the ring. But he lied about the Blue Sapphire's cost when he said, without even knowing the Marquise's cost, that the Blue Sapphire was more expensive than the Marquise because it contained *both* blue sapphires and Crown of Light diamonds set in a 14K white gold band. Neither the Blue Sapphire's Statement nor the sales receipt support Vaswani's statement. When Jeanette learned of Blue Sapphire's actual four thousand six hundred dollar ($4,600) price, Vaswani – lacking any demonstrative proof – repeated his lie and explained that the lower price was the difference of the Blue Sapphire price minus the Marquise ring's "Trade-In Amount." For Vaswani's statement to be true then the Blue Sapphire's price, as recorded on both the sales receipt and Statement, should have been at least five thousand five hundred dollars ($5500) for it to satisfy the Terms and Conditions provision. Yet, neither the sales receipt nor Statement reflect that price; thus, as a result, the upgrade failed to meet Jeanette's expectations and breached the Terms and Conditions provision.

### C. Independent Appraisal

61.     Almost immediately upon returning home, Jeanette and Kenneth were suspicious of the jewelry's quality and value for several reasons. First, Vaswani never mentioned t the actual price of each piece of jewelry nor did each piece come with a price tag. Rather, to induce the couple into making unnecessary purchases, Vaswani

mentioned the more palatable monthly financing price to distract from the "sticker shock" that would rightly accompany an inflated price. Second, Vaswani refused to honor the couple's discounts that would have significantly lowered the purchase price and reduced Vaswani's commission from the sale. Third, Diamonds International, with the help of its partner, Royal Media, lured Jeanette and Kenneth to the store with the promise of attractive discounts (that were never going to be honored) only for the Diamonds International's employees to apply intense pressure tactics, which included refusing to allow the couple to leave, until the couple purchased grossly overpriced jewelry as a result of the deception, lies, and unsubstantiated claims regarding the Crown of Light diamond's quality and value.

62.     Jeanette and Kenneth – feeling bamboozled, deceived, and defrauded – contacted Diamonds International to express their displeasure, request pertinent documents related to their purchases, such as the warranties, gem reports, and Statements of Value,[8] and for a list of Diamonds International authorized appraisers who could verify the Statements' accuracy.

63.     Initially, Jeanette and Kenneth consulted a Diamonds International authorized appraiser who, while refusing to take the couple's money, candidly told the couple that authorized appraisers are limited to valuations provided to them by Diamonds International through outdated pricing lists that are not amended to

---

[8] According to Vaswani, he allegedly discounted the jewelry – more substantially than Jeanette and Kenneth's discount certificates – to give them a better "deal" for their purchases. Thus, the Statement of Value cannot reasonably reflect the jewelry's actual value if the purchase price reflected on the Statement takes into account the "deal" offered by Vaswani

reflect trends in the diamond market.[9] The appraiser explained that authorized appraisers essentially regurgitate Diamonds International's valuations because the company sets the pricing without providing any clarity and/or insight into the company's methodology. Moreover, the authorized appraiser said they were proprietary pieces; therefore, Diamonds International sets the price so the diamonds are appraised for their purchase price. Most importantly, the appraiser, even more candidly, said neither the jewelry's quality nor value were worth the price paid by the couple in December 2019.

64.     Thereafter, Jeanette and Kenneth sought a truly *independent* appraisal without much initial success because nearly every jeweler refused to appraise Crown of Light diamonds because the jewelry does not have any resell value since Diamonds International is the *exclusive* repairer and servicer of Crown of Light diamonds. This was a direct repudiation and contradiction of Vaswani's false statement assessing the investment and resell value of grossly overpriced Crown of Light diamonds.[10] Vaswani knew that his statement regarding the jewelry's resell value was false because Diamonds International is the *exclusive* retailer for Crown of Light diamonds – a point the Company repeatedly emphasizes.

---

[9] According to a Diamonds International promotional video, the Company "formulated a beautiful package for appraisers, which all appraisers should know about." The "Crown of Light Appraisers Booklet Version 3.0" contains weight estimations, the methodology, and an understanding of the pricing on the different stones.

[10] Subsequent research revealed that Crown of Light jewelry is the subject of *widespread* criticism because of the quality of the stones, inflated pricing, poor customer service, dishonesty, and, at times, employee theft of customers' jewelry.

65.     Vaswani's statements were egregiously false – not mere sales puffery. He fraudulently misrepresented the quality, value, and resell value of the jewelry in order to induce Jeanette and Kenneth into purchasing grossly overpriced jewelry.

66.     Jeanette and Kenneth were eventually successful in getting a truly *independent* appraisal from a graduate gemologist that is knowledgeable and trained in the more stringent Gemological Institute of America ("GIA") standards. The gemologist's valuation of the Crown of Light jewelry was significantly lower than Diamonds International's valuation and, ultimately, the price paid by the couple.

67.     Not only was the jewelry's value inflated, its quality, too, was overstated. According to the graduate gemologist's independent appraisal, Diamonds International's Statements of Value misrepresent the jewelry's carat, clarity, and color, which directly affect its quality and value. For example, the diamond bracelet's Statement misrepresents the diamonds' color, and the diamond pendant's Statement significantly misrepresents its clarity.

68.     The graduate gemologist's appraisal also revealed that the Statements of Value misrepresent the total carat weight ("ct") of both the Hublot and diamond pendant. The Hublot's Statement misrepresents that the total carat weight is 2.89 ct when the accurate total carat weight is 2.00 ct; and the diamond pendant's Statement misrepresents that the total carat weight is 2.03 ct when it is appraised at 1.77 ct. That is a difference of 1.15 ct. Meaning, Jeanette and Kenneth paid for more total carat weight than the couple actually received. The gemologist's appraisal proves that Jeanette and Kenneth grossly overpaid based on the diamonds' carat, clarity, and

28

color. These deceptive practices and fraudulent misrepresentations resulted in a tremendous loss for Jeanette and Kenneth.

69.     The Blue Sapphire's independent appraisal left Jeanette and Kenneth angry, disappointed, frustrated, and surprised. First, not only was the ring not an upgrade because its appraisal value is only two thousand six hundred dollars ($2,600) – meaning the couple paid two thousand dollars ($2,000) more for the ring that it is actually worth. The most damning revelation is that the Blue Sapphire does not contain Crown of Light diamonds as falsely stated in the "Item Description" section of the ring's Statement. Instead, it contains only *white sapphires*. Such a discrepancy demonstrates that the Statement does not accurately reflect the Blue Sapphire's actual value because it factors the inclusion of Crown of Light diamonds in its valuation.

70.     The difference between the jewelry's actual value and price paid by Jeanette and Kenneth is so significant that it amounts to a material misrepresentation of fact – not mere sales puffery. Moreover, Jeanette and Kenneth believed the fraudulent misrepresentation that the jewelry was a great investment because the couple lacked the same information and same sophistication vis-à-vis Diamonds International.

71.     Jeanette and Kenneth relied on the fraudulent misrepresentations as statements of fact concerning the quality and value of the jewelry because the couple was led to believe that the Shopping Guide was a resident jewelry expert on board the cruise ship as a benefit and service to help the couple navigate the local shopping landscape.

Jeanette and Kenneth did not expect the Shopping Guide to act as a salesperson – paid spokesperson and proxy – for Diamonds International.

72.     When Jeanette and Kenneth contacted Diamonds International to express their concerns, the retailer made the couple, figuratively, jump through endless hoops to resolve the couple's dispute only to eventually refuse to refund Jeanette and Kenneth's money. The only resolution offered to Jeanette and Kenneth was to return their jewelry for a Diamonds International store credit. Jeanette and Kenneth declined the offer because the couple did not want to return their grossly overpriced, inferior quality Diamonds International jewelry for a store credit to purchase different grossly overpriced, inferior quality Diamonds International jewelry.

## CAUSES OF ACTION

### COUNT I: Rescission of Sales Contract (Diamonds International)

73.     Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

74.     The Plaintiffs' agreement to pay nearly $120,000 for jewelry from Diamonds International during their Royal Caribbean cruise was induced by fraudulent material misrepresentations by Diamonds International and/or third parties on Diamonds International's behalf.

75.     The Plaintiffs justifiably relied on fraudulent material misrepresentations by Diamonds International and/or third-parties on Diamonds

International's behalf when they agreed to pay nearly $120,000 for jewelry from Diamonds International during their Royal Caribbean cruise.

76.     The Plaintiffs notified the Diamonds International that they wished to rescind their agreement to purchase the jewelry within a reasonable time of learning that the Defendants' fraudulent material representations about the jewelry they purchased were indeed false.

77.     The Plaintiffs are entitled to rescission of their purchases from Diamonds International and request that this Court order Diamonds International to accept a full return of the jewelry the Plaintiffs purchased, returning the purchase price received from the Plaintiffs and nullifying outstanding debts owed by the Plaintiffs to Diamonds International and Diamonds International's finance partners, Comenity Bank and Synchrony.

## COUNT II: Breach of Warranty (All Defendants)

78.     Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

79.     At the time of the Plaintiffs' purchase of the jewelry at issue, the Defendants were engaged in the business of selling diamonds to retail customers, either directly, or by partnering with third-parties to surreptitiously market Diamonds International and its jewelry as seemingly independent experts and consumer advocates in return for monetary compensation from Diamonds International.

80.     Defendants made various statements of fact and "guarantees" regarding the jewelry the Plaintiffs agreed to purchase, as detailed above.

81.     The Defendants warranted to the Plaintiffs that the jewelry would appraise for at least the sales price. The Defendants did not disclose or explain that they would only honor the warranty if the methodology of the appraisal was to appraise the jewelry for its sales price. As such, the Plaintiffs reasonably understood the Defendants' warranty at the time of same as warranting that the jewelry would be worth the sales price. A reasonable customer would not expect the qualification the Defendants attempted to make after the fact because it would make the warranty entirely illusory and meaningless.

82.     The jewelry was not worth anywhere close to the sales price the Plaintiffs paid Diamonds International, and did not appraise for anywhere close to the sales price that the Plaintiffs paid Diamonds International. As a result, the Plaintiffs suffered damages.

83.     Wherefore, the Plaintiffs demand that judgment be entered against the Defendants for an award of compensatory damages, costs, and pre- and post-judgment interest. Alternatively, Plaintiffs demands rescission of their purchases with Diamonds International.

## COUNT III: Breach of Implied Warranty of Merchantability
## (Diamonds International)

84.     Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

85.     Diamonds International's sale of the diamond pendant, diamond bracelet, and upgraded Marquise ring, among other things, to the Plaintiffs implied, as a matter of law, that those items were merchantable and fit for its ordinary purpose – wearing as jewelry.

86.     The ordinary purpose of the jewelry purchased by the Plaintiffs was to be worn regularly as jewelry. As such, this implied a warranty of fitness for specific purpose that the jewelry was appropriate to wear regularly.

87.     As a result of Diamonds International's breach of warranty, Plaintiffs suffered damages.

88.     Wherefore, Plaintiffs demand rescission of their purchases with Diamonds International. Alternatively, Plaintiffs demand entry of the judgment against Diamonds International for an award of compensatory, costs, and pre- and post-judgment interest.

### COUNT IV: Breach of Applicable Consumer Protection Acts
### (All Defendants)

89.     Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

90.     The conduct of the Defendants – all US-based companies – in the scheme outlined in this Complaint was directed primarily towards U.S. citizens like the Plaintiffs, with the knowledge, direction, and active participation of the Defendants' U.S. offices, including Diamonds International and Almod Diamonds' offices in New York.

91.     For the purpose of this action, these statutory claims do not require a choice of law analysis because there is no material conflict of law.

92.     The Defendants' scheme is only successful because cruise ship passengers, primarily U.S. citizens, rely on the Defendants promotion of themselves as United States-based companies who provide U.S.-based customer service.

93.     The Defendants' conduct is subject to and actionable as unfair and deceptive trade practices under N.Y. CLS Gen. Bus. § 349. Alternatively, the Defendants conduct, described above, is subject to and actionable as unfair and deceptive trade practices act statutes of each of the 50 states and Puerto Rico.

94.      Defendants conduct was unfair and deceptive in violation of the U.S. Uniform Deceptive Trade Practices Act ("UDTPA"), including for the following reasons:

a.      Royal Media Shopping Guides acting on behalf of the Defendants misrepresented to the Plaintiffs and other cruise passengers that they were experts in jewelry buying, and could be trusted because they were providing a service for the benefit of Royal Caribbean passengers. These misrepresentations were unfair and deceptive because Royal Media's Shopping Guides were not experts and were not providing disinterested information to the Plaintiff or acting as the Plaintiffs' advocate, but rather, their only goal was to drive sales to Diamonds International for commissions.

b.      Royal Media Shopping Guides acting on behalf of the Defendants misrepresented the nature of Royal Media's relationship with Diamonds International, claiming to passengers, including the Plaintiffs, that Royal Media had "vetted" and had independently determined that Diamonds International provided great value pricing on jewelry, when Royal Media was being paid to direct cruise passengers to Diamonds International retail store, despite being aware that Diamonds International actually sells inferior jewelry for massively inflated prices, and a large number of customers complain about this to Diamonds International, Royal Caribbean, and Royal Media after returning from vacation.

c.      Royal Media Shopping Guides acting on behalf of the Defendants and/or Diamonds International salespeople misrepresented that Diamonds International's prices for diamonds were significantly cheaper than similar diamonds available in the United States due to duty-free and tax laws and because Diamonds International's price was based on the significantly reduced-price Diamonds International and Almod Diamonds pay for raw diamonds as a DeBeers sightholder;

d.      Royal Media Shopping Guides acting on behalf of the Defendants and/or Diamonds International salespeople misrepresented that Diamonds International's prices for diamonds and jewelry were so low relatively to the value of the jewelry, due to U.S. tax laws and Diamonds

International and Almod Diamond's sightholder status with DeBeers, that purchasing jewelry from Diamonds International was "investment quality" or a good investment.

e.      This was not merely sales puffery because Defendants knew that buying jewelry from Diamonds International could not be considered a "good investment" by any stretch of the imagination because the jewelry would not appreciate in value and could never be resold by the Plaintiffs for anywhere near the purchase price. The Diamonds International salesperson specifically misled the Plaintiffs about the amount Diamonds International had paid for the diamond ring.

f.      Royal Media Shopping Guides acting on behalf of the Defendants and Diamonds International salespeople misrepresented that Diamonds International's jewelry is guaranteed to appraise for its sales price because it is such a good value. In reality, Diamonds International's jewelry is grossly overpriced and will only appraise for the price if an absurd and tautological appraisal method is employed, whereby the value is determined entirely based on the price Diamonds International decides to charge. Royal Media Shopping Guides and Diamonds International salespeople's misrepresentations were misleading and deceptive because the statements are reasonably understood by customers, including the Plaintiffs, to mean that Diamonds International's jewelry is being sold for a price at or below the jewelry's

objective market value (as would be determined by an *independent appraiser*), as opposed to a meaningless and tautological guarantee that the jewelry will appraise for the sales price if the appraisal is based on the sales price.

g.     Royal Media Shopping Guides acting on behalf of the Defendants and Diamonds International salespeople misrepresented that Crown of Light diamonds disperse more light and sparkle more than round brilliant diamonds, and are worth more than similar round brilliant diamonds, when in reality, the Crown of Light cut is inferior and less valuable than the round brilliant diamond and there is no real market for Crown of Light diamonds outside of the Defendants' scheme, as detailed above.

h.     Diamonds International sold a GHI-certified 1.77 ct diamond pendant necklace to the Plaintiffs for thirty-eight thousand dollars ($38,000). A comparison of a similar 3.10 ct diamond pendant necklace certified by the more reputable GIA and sold at Tiffany's & Co., one of the world's most luxurious diamond jewelry retailers – sells for thirteen thousand dollars ($13,000). Diamonds International's sale of a more expensive diamond pendant with less brilliance, less total carat weight, and certified by the less reputable GHI is an unethical, unfair, and deceptive trade practice because the unsophisticated consumer does not appreciate the significant difference between "GIA" and "GHI," and does

not understand that a GHI-certified diamond is considered inferior with less resell value for the sale price that would otherwise be expected for the diamond based on its 4Cs.

95.     Diamonds International sold the Plaintiffs jewelry and extended consumer credit in violation of New York City Admin. Code § 20-700(a), including because the jewelry was represented to be of a higher quality than it was, Defendants misrepresented and/or failed to disclose material facts about the jewelry, Defendants made false statements about the price it charges for its jewelry in comparison to the U.S. market, as well as the reasons for supposed cheaper prices than are generally available in the U.S. market.

96.     Diamonds International sold the Plaintiffs jewelry and extended consumer credit in violation of New York City Admin. Code § 20-700(b), including because the Royal Media Shopping Guides acting on behalf of Defendants and the Diamonds International salespeople took advantage of the Plaintiffs' lack of knowledge and experience with respect to buying diamond jewelry, and as a result, massively over charged the Plaintiffs nearly one hundred twenty thousand dollars ($120,000) for the jewelry items detailed above. Those transactions were unconscionable because there was a gross disparity between the price the Plaintiffs paid and the value of the jewelry, as measured by the price at which similar jewelry can be obtained.

97.     The Plaintiffs suffered damages as a result of the Defendants' unfair and deceptive practiced detailed above.

98.    Plaintiffs demands entry of judgment against Defendants for an award of compensatory damages, treble damages, reasonable attorneys' fees, costs, and pre- and post-judgment interest.

### COUNT V: Fraud (All Defendants)

99.    Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

100.    Defendants engaged in a uniform course of conduct that misrepresented the nature of their relationship and the value and material characteristics of the jewelry the Plaintiffs purchased from Diamonds International, including in the following ways:

a.    Royal Media Shopping Guides acting on behalf of the Defendants misrepresented to the Plaintiffs and other cruise passengers that they were "experts" in jewelry purchases and could be trusted because they were providing a service for the benefit of Royal Caribbean passengers. These representations were false because the Royal Media Shopping Guides were not experts and did not provide disinterested information to the Plaintiff, but rather, their only goal was to drive sales to Diamonds International for bonuses, commissions, and other compensation. These misrepresentations were material because the Plaintiffs relied on the Royal Media Shopping Guides purported expertise and apparent independent recommendations when trusting

the other claims of Royal Media Shopping Guides and Diamonds International salespeople about Diamonds International's jewelry.

b.     Royal Media Shopping Guides acting on behalf of the Defendants misrepresented and fraudulently concealed the nature of Royal Media's relationship with Diamonds International, by claiming to passengers, including the Plaintiffs, that Royal Media had "vetted" and had independently determined that Diamonds International provided great value pricing on jewelry, and in failing to disclose that Royal Media was being paid by Diamonds International to direct cruise passengers to Diamonds International retail stores.

c.     Royal Media Shopping Guides acting on behalf of the Defendants fraudulently concealed from the Plaintiffs that Diamonds International is known to sell inferior jewelry for massively inflated prices, and a large number of customers complain about this to Diamonds International, Royal Caribbean, and Royal Media after returning from vacation. Royal Media Shopping Guides had a duty to disclose this information to the Plaintiffs due to the circumstances because they held themselves out as independent experts that vetted Diamonds International, and claimed that prior cruise passengers' jewelry had appraised for multiples of the purchase price.

d.     Royal Media Shopping Guides acting on behalf of the Defendants    and    the    Diamonds    International    salespeople

misrepresented that Diamonds International's prices for diamond jewelry were significantly cheaper than similar diamond jewelry available in the United States due to tax laws and because Diamonds International's price was based on the significantly reduced-price Diamonds International and Almod Diamonds pay for raw diamonds as a DeBeers sightholder;

e.   Royal Media Shopping Guides acting on behalf of the Defendants and the Diamonds International salespeople misrepresented that Diamonds International's prices for diamonds and jewelry were so low relatively to the value of the jewelry, due to U.S. tax laws and Diamonds International's sightholder status with DeBeers, that purchasing jewelry from Diamonds International was "investment quality" or a good investment.

f.   This was false and cannot be considered sales puffery because Defendants knew that buying Diamonds International jewelry could not be considered an investment by any stretch of the imagination because the jewelry would not appreciate in value and could never be resold by the Plaintiffs for anywhere near the purchase price.

g.   Royal Media Shopping Guides acting on behalf of the Defendants and the Diamonds International salespeople misrepresented that Diamonds International's jewelry is guaranteed to appraise for its sales price because it is such a good value. In reality,

Diamonds International's jewelry is grossly overpriced and will only appraise for the sales price if an absurd and tautological appraisal method is employed, whereby the value is determined entirely based on the price Diamonds International decides to charge. Royal Media Shopping Guides and Diamonds International salespeople's representations were designed to materially mislead the Plaintiffs because the statements are reasonably understood by customers, including the Plaintiffs, to mean that Diamonds International's jewelry is being sold for a price at or below the jewelry's objective market value (as would be determined by an *independent* appraiser), as opposed to a meaningless and tautological guarantee that the jewelry will appraise for the sales price if the appraisal is based on the sales price.

h.     Royal Media Shopping Guides acting on behalf of the Defendants and the Diamonds International salespeople misrepresented that Crown of Light diamonds disperse more light and sparkle more than round brilliant diamonds, and are worth more than similar round brilliant diamonds, when in reality, the Crown of Light cut is inferior and less valuable than the round brilliant diamond and there is no real market for Crown of Light diamonds outside of the Defendants' scheme as set forth in this Complaint.

101.   These misrepresentations were material to the Plaintiffs' purchase of the jewelry, and had Defendants not made such misrepresentations, Plaintiffs would not have purchased the jewelry.

102.   Defendants made these misrepresentations to the Plaintiffs in order to induce Plaintiffs into purchasing the jewelry from Diamonds International. These statements were designed to lull the Plaintiff and other cruise passengers into believing that Royal Media had independently vetted Diamonds International, discovered that Diamonds International was selling jewelry for well below market prices; therefore, cruise passengers, including the Plaintiffs, had a rare opportunity to purchase jewelry at such a reduced price that it would also serve as a good investment.

103.   Royal Media assisted, aided, and abetted Diamonds International in perpetrating the fraud alleged in this count. Royal Media was necessary to the fraudulent scheme detailed above. If Diamonds International made these claims on its own, customers like the Plaintiffs, may have been more skeptical and less inclined to rely on them. The Plaintiffs believed the misrepresentations detailed herein because they were first communicated to them by an apparent independent "expert," whose financial interest in driving sales of Diamonds International jewelry was concealed.

104.   Plaintiffs purchased the jewelry detailed above because of the Defendants misrepresentations and omissions of material facts. Had the Plaintiffs known the truth about Diamonds International and the quality and value of the

jewelry detailed above, Plaintiffs would not have purchased the jewelry from Diamonds International.

105.   Because of the Defendants misrepresentations, Plaintiffs suffered damages.

106.   Plaintiffs demands entry of the judgment against Defendants for an award of compensatory damages, punitive damages, costs, and pre- and post-judgment interest.

### Count VIII – Unjust Enrichment (All Defendants)

107.   Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

108.   As the intended and expected result of Defendants' conscious wrongdoing as set forth in this Complaint, Defendants profited and benefitted from payments made to them by Plaintiffs, directly and/or through third parties to whom Plaintiffs remains indebted, for jewelry from Diamonds International.

109.   Defendants voluntarily accepted and shared these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs paid for jewelry when she otherwise would not have done so.

110.   An inequity resulted to Plaintiffs because Defendants kept the benefit and were unjustly enriched.

111.   Plaintiffs is entitled to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent, and in the amount, deemed appropriate by the Court and such other relief as the Court deems just and proper.

**Count IX – Declaratory Judgment (All Defendants)**

112.    Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

113.    Pursuant to 28 U.S.C. § 2201, this Court has subject-matter jurisdiction to declare the rights and remedies of any interested party seeking such declaration, whether or not further relief is or could be sought.

114.    A justiciable controversy exists between the Plaintiffs and Defendants that requires declaratory relief.

115.    Due to Defendants' misconduct, the Plaintiffs seek a declaration that the Plaintiffs does not owe Diamonds International any additional money in connection with the jewelry purchases detailed above.

116.    The Plaintiffs have no adequate remedy at law which would accomplish the relief sought herein.

**Count IX – Negligence (Royal Media)**

117.    Plaintiffs reallege and incorporate by this reference the factual allegations in the preceding paragraphs of this Complaint.

118.    Defendant Royal Media ostensibly undertook to "vet" port city retailers on behalf of Royal Caribbean passengers to identify and recommend "great values" and to provide diamond and gemstone education to Royal Caribbean passengers from industry "experts." By so doing, Royal Media had a duty to the Plaintiffs to do so in a manner that was not negligent.

119. Royal Media breached its duty as to the Plaintiffs, including by (a) recommending Diamonds International as a "great value," (b) leading the Plaintiffs to believe that other passengers had great experiences and had experienced windfalls by purchasing Diamonds International jewelry, when these Defendants knew or should have reasonably discovered that Diamonds International charges among the most unreasonable and highest prices for jewelry in the world and that many passengers who purchased jewelry from Diamonds International thereafter complained that they were cheated, scammed or tricked; (c) by allowing economically interested and non-expert salespeople hold themselves out as experts to provide diamond and gem education to passengers; (d) by failing to provide helpful information to passengers about how to avoid buying grossly overpriced diamond jewelry during seminars that were offered for this ostensible reason.

120. As a proximate and direct result of these Defendants negligence, the Plaintiff paid nearly two hundred thousand dollars ($120,000) for jewelry that was worth only a fraction of the sales price, and thereby suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against Defendants in each claim for relief, jointly and severally, as follows:

A. Rescission of the jewelry purchases detailed above, with the Plaintiffs returning the jewelry to Diamonds International and Diamonds International returning the purchase price to the Plaintiffs and/or the third parties to whom

Plaintiffs became indebted due to the jewelry purchases;

B.   Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.   Awarding treble damages;

D.   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.   Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs demand a trial by jury on all issues so triable.

Date:  November 15, 2022                    Respectfully submitted,

James Sweeting III (Fla. Bar No. 715311)
The Law Offices of James
Sweeting III, LLC.
2225 St. Paul Street
Baltimore Maryland 21218
E: sweetinglaw@gmail.com
P: (443) 267-7534

*Attorney for Plaintiffs Jeanette and Kenneth Vaughan*